## MOSHER v. BURGLASS.*
### No. 16400.

Court of Appeal of Louisiana. Orleans.
Nov. 4, 1936.

Edward Rightor, of New Orleans, for appellant.

A. H. Reed and Yarrut & Stich, all of New Orleans, for appellee.

JANVIER, Judge.

Defendant, Abraham Burglass, is the owner of a tenement building at 1129 N. Rampart street, New Orleans. Plaintiff, Mrs. Frank Mosher, avers that she and her husband, as tenants, occupied an apartment in the said building and she charges that on October 5, 1935, because of the defective condition of the rail of a gallery used by the various occupants of the building, she fell to the ground below when the rail broke from its supports as she was leaning against it. She alleges that she did not know, or have reason to believe, that the rail was defective, and that the accident resulted solely from the vice which existed in the leased premises, for which vice, she maintains, defendant, as owner and lessor, is liable. She enumerates various serious injuries, which she alleges she sustained, the said injuries consisting principally of shortening of her right leg as the result of three fractures, internal injuries in the pelvic region and abdomen, injury to the head and loss of certain teeth and pain and suffering. In her original petition she prays for judgment in the sum of $22,000.

Defendant answered denying that the said rail was in any way defective and alleging that the fall had resulted from the fact "that petitioner carelessly and violently endeavored" to pull a certain squirrel cage "loose from its fastenings" and that, in doing so, she "put her whole weight and strength in the pull and when it came suddenly loose" she "fell very violently and threw her entire weight against said railing, which was not designed to receive said

*Rehearing granted Nov. 30, 1936.

·shock" and that, as a result, the "said railing came loose and precipitated petitioner to the ground" and that "had said plaintiff acted in the usual manner, said accident would not have occurred, and that same was due entirely to the plaintiff's violence and lack of care."

In a supplemental petition Mrs. Mosher and Frank Mosher set forth that they had become obligated to various doctors for medical and hospital attention in the sum of $1,093.50 and they prayed for this amount in addition to the amount at which Mrs. Mosher had estimated her damage in the original petition. In this supplemental petition Mrs. Mosher alleged that, in addition to the obligation to pay said doctors' bills, medical expenses, et cetera, placed upon her husband as head and master of the community, she had personally contracted and bound herself for the payment of the services of one of the doctors in the sum of $1,000.

In a second supplemental and amended petition Mrs. Mosher alleged that since the accident she has been subject to attacks of unconsciousness and spells of dizziness, which overtake her frequently and unexpectedly, and, as compensation for this damage, she prays for a further award in the sum of $10,000.

The Board of Administrators of the Charity Hospital of New Orleans intervened and prayed for judgment against Abraham Burglass in the sum of $475, alleging that to be the extent to which, by reason of the provisions of Act No. 230 of 1932, as amended (Act No. 128 of 1934), he had become indebted to the hospital for services and attention rendered Mrs. Mosher.

The matter was tried by jury and a verdict for $8,000 was rendered in favor of Mrs. Mosher, but the suit, so far as Mr. Mosher was concerned, was dismissed. No action was taken on the intervention of the Charity Hospital and neither that institution nor Mr. Mosher has appealed. Defendant, however, has appealed and now maintains that there is no liability whatever in him for the reasons set forth in his answer, and he also contends that the amount awarded Mrs. Mosher, $8,000, is much in excess of the amount which should represent fair compensation for the injuries sustained.

It is conceded that the gallery rail in question broke away at one end and that Mrs. Mosher fell to the ground from a height of about 16 feet and that the injuries she sustained were serious. But it is contended that the breaking away of the rail was not due to inherent weakness nor to erosion, nor rusting of the nails holding it to the building, defendant relying, as substantiating this defense, upon certain evidence which tends to show that Mrs. Mosher was the owner of a squirrel which she kept in a cage, which, at the time, had been hooked over the faucet above a slop sink located on the side of the building, and that, as Mrs. Mosher attempted to remove the said cage from its position, hanging upon the said faucet, it caught on the said faucet, and that, as she pulled it away, she did so with such violence that, when it became unhooked, she fell upon the adjacent rail with such force that the said rail gave way, it not being designed to withstand so unusual a force.

It is not necessary that we cite any of the numerous authorities which hold that, in this state, there is written by law into every contract of lease a warranty that the leased property contains no defects and that the lessee and all other persons lawfully upon the premises may subject any part thereof to any of the uses for which the property is intended. Therefore, as we said in Brown v. Pons, 147 So. 560, 561: "It follows that, if the rail gave way while it was being used for a purpose for which such rails are customarily used and plaintiff himself was not contributorily negligent in relying upon a manifestly defective rail, then the owner of the premises is liable, because 'the lessor warranted the solidity of the balustrade for all legitimate purposes.' Evans v. Hollander, 2 La.App. 409."

Thus, the primary question of liability, vel non, depends solely upon a question of fact, to wit: Was the rail being used in a normal manner, or was it subjected to a strain substantially greater than should have been placed upon it, because there is no liability resulting from the breaking of such a rail if the injured person was negligent in subjecting it to pressure or strain obviously greater than it was designed to withstand. In that case we also said: "But the warranty which is by law written into every contract of lease does not go so far as to render the lessor liable for all injuries sustained, and his responsibility cannot be extended so as to include damages which result from abnormal and unexpected use of such portions of his building as rails, stairways, galleries, et

cetera, which, although they may be entirely safe if used in the manner in which the lessor is justified in assuming that they will be used, are entirely unsafe if subjected to unreasonable and extraordinary stress or strain."

To the same effect, the Supreme Court, in Glain v. Sparandeo, 119 La. 339, 44 So. 120, 121, said: "The use to which the railing of the gallery was subjected was not the ordinary use for which the lessor is presumed to have warranted it, and, whilst persons, in moving heavy articles, may choose to rely on such supports, they do so at their own risk when the customary and safer way is open to them."

■ There is a mass of evidence concerning the condition of the rail which gave way, and from it, in spite of the conflicting opinions of various building experts and architects, we have no hesitation in reaching the conclusion that the rail was not in good condition and that, at the time, it was not susceptible of withstanding such reasonable strain as might have been placed upon it and that, although Mrs. Mosher may have fallen against it as the result of releasing the squirrel cage from the faucet, the pressure exerted by her was not sufficiently in excess of that which would have been exerted by her merely leaning against it, or, leaning over it to render it proper to say that it was substantially greater than she should have expected the rail to withstand. She was not a large woman, weighing only about 130 pounds, the gallery was not wide, and we do not believe that, even if she jerked the cage away from its support as violently as she could have, she could have fallen against the said rail with anything like the force which the experts think a properly constructed and properly attached rail should withstand.

There is much evidence to the effect that the landlord, or persons representing him, had inspected the building and had inspected the very rail in question and had shaken it and that it had given no evidence of inherent defect. There is other evidence to the effect that much larger persons had leaned against it in making use of clotheslines, which extended from that gallery to other adjacent buildings, and it is contended from this that, since the rail withstood the pressure so exerted against it, it could not have given way had not Mrs. Mosher struck it with tremendous force.

But without finding it necessary to discuss in detail the evidence, we find that the rail, as the result of time and the drying of the wood of which it was constructed, had shrunk and had pulled away at one end from the building and had left open a space of something more than a quarter of an inch. Obviously, in doing this the nails had either pulled into the rail or had pulled out of the building, thereby weakening the hold between the two. It also appears that the nails themselves had rusted and corroded to a considerable extent, that the whole structure was between 40 and 50 years old, and that, all in all, it was not calculated to withstand even normal pressure of a person stumbling or falling against it. It is to be presumed or expected that persons may stumble or fall against such a rail, and that is all that Mrs. Mosher did, even if defendant's contention is correct. If such a rail cannot withstand the pressure of a person stumbling or falling against it, it cannot serve the purpose for which it is intended.

The situation, as we find it, is substantially different from that which confronted us in Brown v. Pons, supra, for there we agreed with the district judge in his finding that the plaintiff, a full-grown negro man weighing 174 pounds, had taken a tub of water, had leaned over the rail, and, with his entire weight and strength, had attempted to throw the water from the tub a considerable distance across the adjoining yard, and we also agreed with the finding of the district judge that "the posts and railing itself were of sound wood" and that "the allegation that the nails were rotten * * * was not borne out by the evidence."

■ There is, then, liability for such injury as Mrs. Mosher actually sustained, because the law of this state which makes an owner or landlord liable makes no distinction between those portions of the property of which the tenant has exclusive use and those portions which are available to be used jointly with other tenants or occupants. In fact, if there is any distinction, the liability should be more certain where injury results from defects in those portions which are reserved for the common use of all the tenants than where the injury results from defects in those portions of which the tenant has the exclusive use. We discussed this question in Caulfield v. Saba, 144 So. 907, and, after referring to many cases, cited the following language used by the Supreme Court in Glain v. Sparandeo, supra: "The lessor, we think, is as much bound for the safety, for ordinary use, of the necessary approaches and exits to and

from the apartments which he lets as for the safety of the apartments themselves."

Since the judgment rendered did not recognize any right in the Charity Hospital of New Orleans, and since that institution took no appeal, we find it unnecessary to give consideration to that intervention. Likewise, the claim of Mr. Mosher need not be considered, since it was dismissed in the district court and he has not appealed.

The injuries to Mrs. Mosher were very serious. She sustained a triple fracture of her right leg. Dr. Hatch described her injury as a fracture of the upper part of her right leg and fracture of the patella, or kneecap. He also stated that she had a skull fracture. When asked whether the fractures were serious, he answered: "About as serious as I would want to see." He testified that, although the fractures had practically healed when he first took charge of Mrs. Mosher, there was "not a perfect position, but as much as could be gotten," and that, as a result, at that time there were only fifteen degrees of motion in the right knee. He states that he and his assistant manipulated the leg and did everything possible to restore free motion, and that substantial results were obtained, but that the injuries would be permanent to some extent and that the leg would always remain approximately a half-inch shorter than the other. He made a complete examination and did not attribute all of the injuries to the accident in question. In his report to plaintiff's physician, which is in the record, he stated that "a queer sort of deafness in her right ear and trouble with her eyesight * * * I am sure have no connection with the accident" and that "the queer chest sensation she complains of * * * I am very much inclined to discount." He also stated that, although the "femur fractures have not healed perfectly, they represent a very good surgical result." He referred to the fact that, although the leg was a half-inch shorter than the other, and although a shortening of one leg usually causes a tilting of the pelvis and a compensatory curvature of the spine, where such shortening is only about a half-inch it could be compensated for by a special shoe, which could be built up a quarter of an inch inside and a quarter of an inch outside.

As to the concussion of the brain, or fracture of the skull, Dr. Fenner, who is a member of the staff of Charity Hospital and was the supervising physician, states

that he could not recall any outward objective symptoms of an injury to the head.

Dr. Ficklen, an eminent surgeon, was employed by defendant to examine Mrs. Mosher and to report on her condition. He testified that he found "two fractures of the right thigh-bone" and another fracture of the right kneecap. He found a small curved scar about a half-inch in length above the right eyebrow which was not conspicuous and he found that there were missing from plaintiff's mouth seven teeth, but that he could not state whether their absence was due to the accident. He found the leg about a half-inch shorter than the other. He was of the opinion that plaintiff could walk without a stick and concluded with the statement that the leg was impaired approximately 20 or 25 per cent. and that this impairment will be permanent.

Shortly after the accident had occurred and when it became apparent that plaintiff contemplated the filing of a suit for a large amount, defendant employed detectives, who obtained plaintiff's confidence and made several social engagements with her, during the course of which it became quite apparent to them that plaintiff intended to exaggerate her injuries as much as possible. She told them that, until her damage suit was tried, she could not dance, that she could not drive an automobile, and, whenever she thought it wise to do so, she used a cane and limped to an exaggerated extent. We have no hesitation in concluding from the record that on such occasions she attempted to make her injuries seem as serious as possible, and that, as a matter of fact, on those occasions she could have walked without a stick, could have driven an automobile to some extent, and that she did not suffer then so much as she testifies she did.

Nevertheless, we are of the opinion that the amount awarded her, taking into consideration the very large medical bills which have accumulated and the great pain which she bore, as Dr. Fenner says, with great co-operation and fortitude, entitles her to an award approximating that fixed by the jury and apparently approved by the district judge. Had her injuries been as serious as she contends, the amount awarded might have been considered by us as inadequate.

In Bacon v. N. O. Public Service, Inc., 18 La.App. 96, 137 So. 213, is found a case in which the injuries sustained somewhat

resembled those suffered by Mrs. Mosher and there we rendered a decree for $6,091.50. Here the medical bills and expenses alone amounted to $1,093, and the injuries to Mrs. Mosher, possibly somewhat greater than those of Bacon, seem to us to justify the award rendered below.

In Matsler v. Jones Motor Co., Inc., 14 La.App. 175, 128 So. 721, judgment for $8,500 was increased on appeal to $10,000. There there was a fracture of the tibia and a splitting fracture across the head and shaft of the fibula. The injuries of plaintiff made it necessary for the balance of her life that she use crutches, or, at best, a stick, and that she could never again stand on her feet alone. She was an osteopath and the court found that her injuries would make it practically impossible for her to continue the practice of her profession.

Counsel for plaintiff also call our attention to Koch v. Southern Cities Distributing Co. et al., 18 La.App. 664, 138 So. 178, 180, in which a judgment based on a jury verdict amounting to $35,590 was reduced to $15,995. But the injuries sustained by the plaintiff in that case were substantially greater than those suffered by Mrs. Mosher. In the first place it was shown that plaintiff was 38 years of age and had been earning $250 a month; that "he was lacerated and torn about the body, and his nose and right foot broken"; that the lacerations and tears were so extensive that when the wounds were dressed he was scarcely recognizable by his friends, and the court further found that the plaintiff's nervous condition was such that he was compelled to take sedatives to sleep. The court said: "He is now almost a nervous wreck, and * * * it will be a long time before he can recover, if he ever can."

We have referred to the plaintiff as Mrs. Mosher. Defendant contends that she was not the wife of Mosher and that her unwillingness to give any information as to the date or place of her marriage and the same unwillingness of Mosher to give any information throw considerable doubt on this question. But it is unnecessary that we decide it, since, in any event, she is entitled to recover for her injuries and for such amount as she has personally obligated herself to pay. If the evidence on this point affects Mrs. Mosher's credibility, that only serves to throw doubt upon her testimony as to the extent of her suffering and her inability to use her leg, and we are of opinion

that the award of $8,000 is justified by the objective symptoms of injury which all of the doctors found, without giving credence to her own testimony as to her disability.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be, and it is, affirmed at the cost of appellant.

Affirmed.